**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JERETH CAMACHO, derivatively on behalf of ORGANON & CO., | |
| Plaintiff, | Case No.: _____ |
| vs. | |
| KEVIN ALI, MATTHEW WALSH, CARRIE S. COX, ROBERT ESSNER, ALAN EZEKOWITZ, HELENE GAYLE, ROCHELLE B. LAZARUS, DEBORAH LEONE, PHILIP OZUAH, CYNTHIA M. PATTON, GRACE PUMA, and SHALINI SHARP, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ORGANON & CO., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jereth Camacho ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Organon & Co. ("Organon" or the "Company"), files this Verified Shareholder Derivative Complaint against Kevin Ali ("Ali"), Matthew Walsh ("Walsh"), Carrie S. Cox ("Cox"), Robert Essner ("Essner"), Alan Ezekowitz ("Ezekowitz"), Helene Gayle ("Gayle"), Rochelle "Shelly" B. Lazarus ("Lazarus"), Deborah Leone ("Leone"), Philip Ozuah ("Ozuah"), Cynthia M. Patton ("Patton"), Grace Puma ("Puma"), and Shalini Sharp ("Sharp") (collectively, the "Individual Defendants," and together with Organon, the "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of their fiduciary duties as directors and/or officers of Organon, unjust enrichment, abuse of

control, gross mismanagement, waste of corporate assets, and against Defendants Ali and Walsh for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Organon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Organon's directors and officers from October 31, 2024 through April 30, 2025, inclusive (the "Relevant Period").

2.    Organon is a global healthcare company primarily focusing on women's health. Organon provides a range of health solutions through a portfolio that includes prescription therapies and medical devices.

3.    The Company markets more than 70 products, which are sold through various channels including drug wholesalers and retailers, hospitals, government agencies, and managed health care providers such as health maintenance organizations, pharmacy benefit managers and other institutions. The Company maintains six manufacturing facilities, located in Belgium, Brazil, Indonesia, Mexico, the Netherlands and the United Kingdom.

4.    The Company acquired Dermavant Sciences Ltd. ("Dermavant") in October 2024

in order to expand its product portfolios. Dermavant is a company which develops and commercializes therapeutics in immune-dermatology. In May 2022, Dermavant's novel topical treatment, *Vtama* 1%, was approved by the U.S. Food and Drug Administration ("FDA"). Following the acquisition, the FDA approved *Vtama* for additional indication of topical treatment of atopical dermatitis, in adults and children two years of age and older, in December 2024.

5.    Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the Company's prioritization of its capital allocation strategy through regular quarterly dividends. The Company concealed the extent to which it was prioritizing Organon's debt reduction strategy following the Dermavant acquisition. For example, on October 31, 2024, the Company published a press release announcing its third quarter 2024 financial results (the "3Q24 Press Release") and held an accompanying earnings call (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Walsh detailed the impact of the Dermavant acquisition on the Company, stating:

> We provide a closer look at our cash flow year-to-date. ***And despite some minor headwinds from the Dermavant acquisition, as Kevin mentioned, we're well on track to deliver approximately $1 billion of free cash flow before onetime charges.*** Year-to-date, those onetime spin-related costs were $137 million. Our global ERP implementation is now behind us, and that was the largest driver of these onetime costs. Our view into the fourth quarter is that costs in this category will be minimal. So we expect to finish the year at approximately $150 million which is better than the $200 million of onetime spin-related costs that we were originally forecasting for 2024. Next year, in 2025, we would expect onetime spin-related costs to be de minimis.
>
> In the $129 million of other onetime costs, here, we capture head count restructuring initiatives and manufacturing network optimization. The cash outlay for these network optimization costs have amounted to $44 million year-to-date 2024. They are distinct from the spin-related costs and that they're associated with actions to separate our manufacturing and supply chain activities away from Merck, which will ultimately drive cost efficiencies and eventual gross margin improvement. We expect this bucket to total about $75 million this year.
>
> Turning to Slide 12. ***We ended the quarter at 4.0x on our net leverage ratio, which***

*was a 0.25 turn better than this time last year and also slightly better than where we were at year-end, 4.1x. Year-to-date, we have had stronger EBITDA generation, which has resulted in a leverage ratio at September 30, 2024, that is more favorable than our expectations at the start of the year. That said, it will take us several quarters to digest the Dermavant acquisition before leverage can return to the 4.0x net leverage ratio that we've achieved as of this quarter end.*[1]

6.      The truth regarding the Company's concealment of its prioritization of debt reduction over capital allocation did not fully emerge until May 1, 2025, when Organon published a press release detailing its first quarter 2025 financial results (the "1Q25 Press Release"), which revealed that the Company's management reset the dividend payout from $0.28 to $0.02. In the press release, Defendant Ali stated, in relevant part:

> We have reset our capital allocation priorities to accelerate progress towards deleveraging, enabling a path to achieve a net leverage ratio of below 4.0x by year-end. Over the last year, we have established a leaner, more fit-for-purpose cost structure while increasing revenue contribution from our core growth drivers. By deleveraging more rapidly, we will continue to strengthen the future prospects of the company. Over time, this will position us to execute more of the compelling business development we've done to date, bringing in additional growth drivers to our portfolio, while maintaining lower leverage. With key growth drivers, Nexplanon and Vtama, on track to achieve their revenue objectives for the year, we are affirming our full year revenue and Adjusted EBITDA margin guidance, as well as our target of generating over $900 million of free cash flow before one-time costs.

7.      That same day, the Company held an earnings call to, *inter alia*, address the dividend shift (the "1Q25 Earnings Call"). Defendant Ali stated on the call that the Company "announced that we have reset our dividend payout, and we'll direct those funds to debt reduction." Also during the call, Defendant Walsh explained the reasoning behind the decision, stating, "The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issues, and so returning capital to shareholder is right now, less of a priority."

---

[1] Unless stated otherwise, all emphasis added.

8.    On this news, the price of the Company's stock fell $3.48 per share, or approximately 27%, from a closing price of $12.93 per share on April 30, 2025 to close at $9.45 per share on May 1, 2025.

9.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) despite claims that quarterly dividends were the Company's "#1 capital allocation priority," future payments were at risk; (2) after acquiring Dermavant, the Company shifted its capital allocation strategy to focus on reducing debt; and (3) this debt reduction plan would result in an over 70% cut to the quarterly dividend. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), and its Chief Executive Officer ("CEO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in

this District.

**PARTIES**

**Plaintiff**

17.     Plaintiff is a current shareholder of Organon. Plaintiff has continuously held Organon common stock at all relevant times.

**Nominal Defendant Organon**

18.     Organon is a Delaware corporation with principal executive offices at 30 Hudson Street, Floor 33, Jersey City, New Jersey 07302. Organon's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OGN."

**Defendant Ali**

19.     Defendant Ali has served as the Company's CEO and as a Company director since 2021.

20.     The Schedule 14A the Company filed with the SEC on April 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Ali:

> Since 2021, Mr. Ali has served as the CEO of Organon, with the vision of creating a better and healthier every day for every woman around the world. Mr. Ali has more than three decades of healthcare and commercialization experience from Merck, where he held a number of leadership roles, including President of Merck's global enterprise portfolio strategy initiative from 2019 to 2021. This work led to the formation of Organon, with Mr. Ali being instrumental in this new company's design and the selection and placement of its senior leadership team. Prior to that, he was President of Merck's international business from 2017 to 2019, responsible for commercial markets outside the U.S., which accounted for 96% of the world's population and over half of Merck's pharmaceutical revenues. Under Mr. Ali's leadership, the business was a significant driver of Merck's growth. Previously, Mr. Ali served as President of the Emerging Markets region where he transformed Merck's performance in many countries for sustained growth and strength. Earlier in his career at Merck, Mr. Ali was the Managing Director of Germany and Turkey and also led key therapeutic franchises. Mr. Ali received an M.B.A. from Santa Clara University and a bachelor's degree from the University of California, Berkeley. Mr. Ali brings to the Board significant pharmaceutical and commercial experience and extensive knowledge of the industry's customers as well as Organon's core portfolio areas and global operations.

7

**Defendant Walsh**

21.    Defendant Walsh has served as the Company's EVP and CFO since 2021.

22.    The 2025 Proxy Statement stated the following about Defendant Walsh:

Mr. Walsh is responsible for the development and execution of Organon's financial strategy. He is focused on driving profitability and shareholder value and ensuring the highest standard of financial integrity for Organon so it can reach its vision of becoming a leading women's health company. Over his career, Mr. Walsh has served in several public companies as the CFO and in related roles. Before joining Organon, Mr. Walsh was the Executive Vice President and CFO at Allergan plc, a global pharmaceutical company, from 2018 to 2020, and Catalent, Inc., a global provider of delivery technologies, development, and manufacturing solutions for drugs, biologics, cell and gene therapies, and consumer health products from 2008 to 2018, as Senior Vice President from 2008 to 2012 and Executive Vice President from 2012 to 2018. Previously, he held finance and leadership positions at Escala Group and GenTek. Mr. Walsh has also served in corporate development and other roles in the chemical and banking industries. Mr. Walsh is a CFA® Charterholder. Since 2020, he has served on the board of directors and as Chair of the Audit Committee of Certara, Inc., a provider of software and consulting services to the life sciences industry, and previously was a board member of Multicolor Corporation, a label solutions provider. Mr. Walsh received an M.B.A. and bachelor's degree in chemical engineering from Cornell University.

**Defendant Cox**

23.    Defendant Cox has served as Chairman of the Board since 2021. She also serves as the Chair of the Talent Committee and as a member of the Portfolio Development Committee and Environmental, Social and Governance Committee.

24.    The 2025 Proxy Statement stated the following about Defendant Cox:

Ms. Cox serves as Chairman of Organon's Board. Ms. Cox served as the Chief Executive Officer of Humacyte, Inc., a then privately-held regenerative medicine company, between 2010 and 2018; in addition, she served as Chairman of the company's board between 2013 and 2019, and she remained a member of its board until 2021, prior to its public offering. Ms. Cox served as Executive Vice President of Schering-Plough Corporation and President of Schering-Plough's global pharmaceutical business between 2003 and 2009, when Schering-Plough merged with Merck. Prior to joining Schering-Plough, Ms. Cox served as President of Pharmacia Corporation's global pharmaceutical business from 1997 until its merger with Pfizer Inc. in 2003. She also currently serves as Chairman of the boards of directors of Cartesian Therapeutics, Inc. and Solventum Corporation, and as a

director of Texas Instruments Inc. She served as chairman of the boards of directors of Selecta Biosciences, Inc. (from 2019 until its merger with Cartesian Therapeutics, Inc. in 2023) and Array BioPharma Inc. (from 2018 until its acquisition by Pfizer Inc. in 2019). She also served on the board of directors of Celgene Corporation from 2009 until its acquisition by Bristol-Myers Squibb Company in 2019, on the board of directors of Cardinal Health Inc. between 2009 and 2023, and as Chairman of the board of directors of electroCore, Inc. between 2018 and 2020. Ms. Cox is a graduate of the Massachusetts College of Pharmacy. Ms. Cox brings to the Board her prior management experience as an executive of a large pharmaceutical company, as well as extensive leadership and corporate governance experience with other large and small biopharma companies.

**Defendant Essner**

25.     Defendant Essner has served as a Company director since 2021. He also serves as the Chair of the Environmental, Social and Governance Committee and as a member of the Portfolio Development Committee.

26.     The 2025 Proxy Statement stated the following about Defendant Essner:

Mr. Essner is the former Chairman, Chief Executive Officer and President of Wyeth Pharmaceuticals, Inc., a global pharmaceuticals company, which is now part of Pfizer Inc. Specifically, he served as Wyeth's Chairman between 2003 and his retirement from Wyeth in 2008, as its Chief Executive Officer between 2001 and 2007, its President between 2000 and 2006, its Chief Operating Officer between 2000 and 2001 and its Executive Vice President between 1997 and 2000. Prior to Wyeth, Mr. Essner spent more than a decade in various senior management positions at Sandoz Pharmaceuticals Corporation, in addition to serving as a Senior Advisor of Global Healthcare for The Carlyle Group Inc., a private equity, alternative asset management and financial services corporation, between 2009 and 2019. He also serves as an Executive in Residence and Adjunct Professor of Business at Columbia Business School, where he teaches courses in healthcare management, and previously served as a director of Amicus Therapeutics Inc. Mr. Essner is a graduate of Miami University and received his master's degree from the University of Chicago. Mr. Essner brings to the Board extensive industry leadership experience in the pharmaceutical industry.

**Defendant Ezekowitz**

27.     Defendant Ezekowitz has served as a Company director since 2021. He also serves as a member of the Audit Committee and Portfolio Development Committee.

28.     The 2025 Proxy Statement stated the following about Defendant Ezekowitz:

Dr. Ezekowitz has been an Advisory Partner at Third Rock Ventures, LLC, a healthcare venture firm, since 2019, and has served as Entrepreneur in Residence at Cardinal Partners, a venture capital firm, since 2011. He also serves as an advisor to Fidelity's Select Biotechnology Portfolio and as a consultant to H. Lundbeck A/S. Dr. Ezekowitz served as the President and Chief Executive Officer of Abide Therapeutics, Inc., a biopharmaceutical company that he co-founded, between 2011 and 2019, when Abide was acquired by H. Lundbeck A/S. Prior to co-founding Abide, he was a Senior Vice President at Merck Research Laboratories from 2006 to 2011 responsible for the Bone, Respiratory, Immunology, Inflammation, Endocrine and Dermatology franchises. Prior to joining Merck, Dr. Ezekowitz was the Chief of Pediatric Services at Partners Healthcare System, Inc. between 1999 and 2006 and at the Massachusetts General Hospital between 1995 and 2006. He served on the board of directors of Partners Healthcare System, Inc. between 2000 and 2006, and he was the Charles Wilder Professor of Pediatrics at the Harvard Medical School and Head of the Laboratory of Developmental Immunology between 1995 and 2006. He currently serves on the board of directors of Septerna, Inc. and Fulcrum Therapeutics, Inc. In 1998, the R. Alan Ezekowitz Professorship in Pediatrics at the Harvard Medical School was established. Dr. Ezekowitz received his medical training at the University of Cape Town in South Africa and received a Doctor of Philosophy degree from Oxford University. Dr. Ezekowitz brings to the Board scientific and leadership experience in the life sciences industry.

**Defendant Gayle**

29.    Defendant Gayle has served as a Company director since 2021. She also serves as

a member of the Environmental, Social and Governance Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Gayle:

Dr. Gayle, an expert on global development, humanitarian, and health issues, was most recently the President of Spelman College in Atlanta, Georgia, the leader in education of women of African descent. Dr. Gayle's career spans almost forty years dedicated to eradicating inequities in health and wealth. Prior to Spelman, she served as the president and CEO of the Chicago Community Trust (2017-2022), an over 100-year-old community foundation currently focused on closing the racial and ethnic wealth gap in the Chicago region. Dr. Gayle formerly served as the Chief Executive Officer of the McKinsey Social Initiative (2015-2017), a nonprofit organization that implemented programs that bring together varied stakeholders to address complex global social challenges, and, for almost a decade (2006-2015) served as President and Chief Executive Officer of the Cooperative for Assistance and Relief Everywhere (CARE), an international humanitarian and global development organization. From 2001 to 2006, she was an executive in the Global Health program at the Bill & Melinda Gates Foundation. Dr. Gayle began her career in public health at the U.S. Centers for Disease Control in 1984 and held positions of increasing responsibility over her 20-year tenure there, ultimately becoming the

director of the National Center for HIV, STD and TB Prevention and achieving the rank of Assistant Surgeon General and Rear Admiral in the United States Public Health Service. In addition to her public health and economic development experience, Dr. Gayle has significant public and nonprofit company governance experience. Dr. Gayle serves on non-profit boards, including the Bill and Melinda Gates Foundation, New America, the Center for Strategic and International Studies and the Brookings Institution. She is a member of the Council on Foreign Relations, the National Academy of Medicine, The American Academy of Arts and Sciences and the American Public Health Association. She served as a director of The Coca-Cola Company from 2013 through 2024 and Palo Alto Networks Inc. from 2021 to 2024. From 2010 through 2021, Dr. Gayle served as a director of Colgate Palmolive Company, and from 2020 through 2022, Dr. Gayle served as a director of GoHealth, Inc. Dr. Gayle received her BA from the Barnard College of Columbia University, her M.D. from the University of Pennsylvania and a master's in public health from The Johns Hopkins University. Dr. Gayle brings to the Board her immense knowledge of the healthcare industry, government and extensive board experience, as well as many years of leadership experience.

**Defendant Lazarus**

31.    Defendant Lazarus has served as a Company director since 2021. She also serves

as a member of the Environmental, Social and Governance Committee.

32.    The 2025 Proxy Statement stated the following about Defendant Lazarus:

Ms. Lazarus has served as Chairman Emeritus of Ogilvy & Mather, a global advertising and marketing communication company, since 2012. Prior to that, she served as Chairman of Ogilvy & Mather between 2008 and 2012 and as its Chairman and Chief Executive Officer between 1996 and 2008. Prior to becoming its Chief Executive Officer and Chairman, she also served as the President of Ogilvy & Mather Direct North America, Ogilvy & Mather New York, and Ogilvy & Mather North America. She is currently on the board of directors of Blackstone, Inc. and Rockefeller Capital Management. She previously served on the board of directors of General Electric Company between 2000 and 2018 and Merck between 2004 and 2020. Ms. Lazarus is a vice chair and trustee of the New York Presbyterian Hospital, a member of the board of overseers of Columbia Business School, as well as several other charitable and civic organizations. Ms. Lazarus is a graduate of Smith College and received her M.B.A. from Columbia University. Ms. Lazarus brings to the Board her strong background in reputation management and consumer insight.

**Defendant Leone**

33.    Defendant Leone has served as a Company director since 2021. She also serves as

a member of the Audit Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Leone:

Ms. Leone is a financial expert and retired partner of the Goldman Sachs Group, Inc., a multinational investment bank and financial services company, which she joined in 1989 and where she became partner in 2008. She also served as the Chief Operating Officer for its Investment Management Division ("IMD") between 2017 and 2019. Prior to that, she served as the Global Director of Internal Audit between 2011 and 2013 and as the Global Controller for IMD between 2008 and 2011. Ms. Leone currently serves on the board of directors of Corebridge Financial, Inc. She also serves as a director of Goldman Sachs Bank USA, the Goldman Sachs Philanthropy Fund, Ayco Charitable Foundation and the Board of Trustees of Syracuse University, where she serves on the Executive Committee and Audit Committee. She is a graduate of Syracuse University and received her M.B.A. from Syracuse University as well. Ms. Leone brings to the Board strategic thinking, regulatory experience, and deep financial and operational expertise.

**Defendant Ozuah**

35.     Defendant Ozuah has served as a Company director since 2021. He also serves as the Chair of the Portfolio Development Committee and as a member of the Talent Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Ozuah:

Dr. Ozuah is the President and Chief Executive Officer of Montefiore Medicine, the umbrella organization for the Montefiore Health System and Albert Einstein College of Medicine, having previously served as the President from 2018 to 2019 and Executive Vice President and Chief Operating Officer from 2012 to 2018 of Montefiore Health System. Between 2005 and 2014, Dr. Ozuah was Chairman of the Department of Pediatrics and has been a Professor in the Departments of Pediatrics and Epidemiology and Population Health since 1992 at Albert Einstein College of Medicine. He currently serves on the board of directors of The Cigna Group and sits on the American Hospital Association's board of trustees. Dr. Ozuah received his M.D. from the University of Ibadan, Nigeria, his master's degree from the University of Southern California, and his Ph.D. from the University of Nebraska. He completed his Pediatric Internship and Residency at Albert Einstein College of Medicine and Montefiore, and his Post-Doctoral Fellowship in Medical Education at the University of Southern California School of Medicine. Dr. Ozuah is on the board of Montefiore Hospital, as well as the NYC Police Foundation and Federal Law Enforcement Foundation. Dr. Ozuah brings to the Board his leadership, medical and healthcare experience and health system delivery expertise.

**Defendant Patton**

37.    Defendant Patton has served as a Company director since 2021. She also serves as

a member of the Audit Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Patton:

Since 2023, Ms. Patton has served as the General Counsel and Corporate Secretary at Tessera Therapeutics, a biotechnology company. Previously, Ms. Patton served as the General Counsel and Secretary at Verily Life Sciences, Alphabet Inc.'s healthtech subsidiary devoted to the study of life sciences between 2020 and 2023. Prior to Verily, between 2005 and 2020, Ms. Patton held positions of increasing responsibility at Amgen Inc., a global biopharmaceutical company, including serving as Senior Vice President, Chief Compliance Officer between 2012 and 2020. While at Amgen, she also served as the chair of the Amgen Foundation. Prior to Amgen, she served as the General Counsel of SCAN Health Plan, a California Health Medicare Advantage Plan. Ms. Patton serves on the board of directors of the NAACP Legal Defense Fund and the Ethics and Compliance Initiative. She also serves on the board of trustees of Vassar College and the National Association for Law Placement Foundation for Law Career Research and Education. Ms. Patton is a graduate of Vassar College and received her J.D. from George Washington University School of Law. Ms. Patton brings to the Board her experience in life sciences and knowledge of data analytics.

**Defendant Puma**

39.    Defendant Puma has served as a Company director since 2021. She also serves as

a member of the Talent Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Puma:

Ms. Puma served as the Executive Vice President, Chief Operations Officer at PepsiCo, Inc., a multinational food, snack and beverage corporation, between 2017 and 2022. Previously, Ms. Puma served as the Senior Vice President, Chief Supply Officer at PepsiCo between 2015 and 2017 and as the Senior Vice President and Global Chief Procurement Officer between 2010 and 2015. Prior to PepsiCo, Ms. Puma served as the Senior Vice President, Global Chief Procurement Officer at United Airlines Holdings, Inc. between 2007 and 2010. Before then, Ms. Puma was in positions of increasing responsibility at then-Kraft Foods, Inc. between 1999 and 2007 and then-Motorola, Inc. between 1995 and 1999. Ms. Puma serves as a member of the Board of Directors of Target Corporation and Phillips 66. Ms. Puma served as a director of Williams-Sonoma, Inc. between 2017 and 2020 and as a director of Marietta Corporation between 2010 and 2015. Ms. Puma is a graduate of Illinois Benedictine University. Ms. Puma brings to the Board her operational, global procurement and supply chain knowledge and experiences.

**Defendant Sharp**

41.     Defendant Sharp has served as a Company director since 2021. She also serves as

the Chair of the Audit Committee and as a member of the Portfolio Development Committee.

42.     The 2025 Proxy Statement stated the following about Defendant Sharp:

Ms. Sharp served as the Executive Vice President and Chief Financial Officer of
Ultragenyx Pharmaceutical Inc., a biopharmaceutical company focused on the
development and commercialization of therapies for rare genetic diseases, between
2012 and 2020. Prior to joining Ultragenyx, between 2006 and 2012, Ms. Sharp
served as the Chief Financial Officer of Agenus Inc., a biotechnology company
focused on cancer immunotherapies, where between 2003 and 2006 she served in
various finance, corporate development and corporate strategy roles. Ms. Sharp
currently serves as a director of Neurocrine Biosciences, Inc., BeiGene, Ltd. and
Septerna, Inc. She previously served as a director of Mirati Therapeutics from 2021
until its acquisition by Bristol Myers Squibb in January 2024, Sutro Biopharma,
Inc. between 2018 and 2023, then-Panacea Acquisition Corporation between 2020
and February 2021, Precision Biosciences, Inc. between 2018 and 2022, Array
BioPharma Inc. between 2017 and 2019 and Agenus Inc. between 2012 and 2018.
Ms. Sharp previously served in strategic planning and as chief of staff to the
chairman of the board of directors of Elan Pharmaceuticals during the company's
restructuring, and as a management consultant at McKinsey & Company and an
investment banker at Goldman Sachs, specializing in healthcare at both companies.
Ms. Sharp received her M.B.A. and undergraduate degrees from Harvard
University. Ms. Sharp brings to the Board her experience in both managing and
leading firms in the biopharmaceutical industry and deep financial expertise.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers, directors, and/or fiduciaries of Organon and

because of their ability to control the business and corporate affairs of Organon, the Individual

Defendants owed Organon and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Organon

in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to

act in furtherance of the best interests of Organon and its shareholders so as to benefit all

shareholders equally.

44.     Each director and officer of the Company owes to Organon and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Organon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.    To discharge their duties, the officers and directors of Organon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Organon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Organon's Board at all relevant times.

48.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

49.     To discharge their duties, the officers and directors of Organon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Organon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Organon's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Organon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Organon and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Organon's operations would comply with all applicable laws and Organon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.    Each of the Individual Defendants further owed to Organon and the shareholders the duty of loyalty requiring that each favor Organon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

51.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Organon and were at all times acting within the course and scope of such agency.

52.    Because of their advisory, executive, managerial, directorial, and controlling positions with Organon, each of the Individual Defendants had access to adverse, non-public information about the Company.

53. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Organon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

56. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Organon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Organon and was at all times acting within the course and scope of such agency.

## ORGANON'S CODE OF CONDUCT

59.     Organon's Code of Conduct (the "Code of Conduct") states that it applies to "[e]very Organon employee, partner and supplier," and that these individuals and entities are "responsible for abiding by our policies and the ethical standards in our Code of Conduct."

60.     In a section titled "Who we are," the Code of Conduct states the following:

**Our Mission**

Deliver impactful medicines and solutions for a healthier day.

**Our Vision**

A better and healthier day for every woman.

**Our Culture**

Organon's legacy of commitment and scientific innovation in Women's Health and our uncompromising dedication to integrity and high ethical standards inspires us in all we do. It is not only what we do that is important, how we do it matters just as much.

Integrity is the foundation for everything we do. Each of us is responsible for fostering a culture of ethical behavior. We know that doing things the right way is the only way.

61.     In a section titled "Our Culture, continued," the Code of Conduct states the following, in relevant part:

**Authenticity and Transparency: Be real**

We actively promote open and honest communication and respectful discussion at all levels of the company. We build trust through transparency and authenticity. We are open about our weaknesses and development areas.

**Empowerment, Accountability and Integrity: Own it**

We make smart, informed decisions at the right levels of the company. We are accountable for our decisions even if they don't work out as planned. When we make mistakes, we own it and we learn from it. We don't compromise on our high ethical standards to achieve business objectives. We know that everything we do sends a message about who we are and what we value.

\* \* \*

**Our Commitment**

We are committed to the best interests of our stakeholders—the broad spectrum of people and communities whose lives we touch.

**Our Shareholders**

Our shareholders trust us with their hard-earned money. In return, we owe them good corporate governance; honest, accurate, and timely performance information; and clear disclosures in public reports and communications.

62.     In a section titled "Our Accountability," the Code of Conduct states the following, in relevant part:

We are accountable for the decisions we make and the conduct that follows. We are accountable to recognize the potential impact of those decisions and actions and to strive to be a role model of personal integrity to our colleagues every day. We don't violate law, policy or procedure and we don't direct or suggest others should do so either.

We are committed to the highest standards of ethics and integrity. We are responsible to our patients and customers, to distributors and suppliers, to shareholders, to our fellow employees, and to the communities we serve worldwide. It is up to each of us to maintain and improve the reputation of Organon and ensure it is a company we can all be proud of.

We are all accountable for delivering high quality products and services.

We are responsible for following Organon's policies. If we have questions, we are responsible to seek guidance. We are responsible to speak up. If we see actions that fail to meet our high ethical standards, we will speak up, and in doing so continue to build upon Organon's strong ethical foundation

63.     In a section titled "Organon's Policies," the Code of Conduct states the following,

in relevant part:

**04 Customer-facing, Marketing and Business Practices**

We provide accurate, balanced information about our products, and do not engage in activities that inappropriately benefit or influence our customers.

**05 Prevention of Bribery and Corruption**

We do not promise, offer, pay, ask for or accept anything of value to improperly influence decisions or actions with respect to our business.

* * *

**09 Financial Integrity**

As responsible stewards, we believe that financial transparency and integrity is vital for safeguarding our assets, ensuring our mission and future success, and fostering trust with our stakeholders.

**10 Conflicts of Interest**

We recognize and disclose situations that may appear to compromise our business judgment or that may unduly influence our business, and where necessary, we implement controls to minimize risk.

**11 Insider Trading**

We do not take actions that undermine investor confidence, such as sharing inside information belonging to Organon and its business partners or sharing "tips" that could unfairly influence investment decisions.

**12 Disclosing Information About Organon**

We are committed to being open and providing appropriate transparency about the way we operate, so that we maintain our stakeholders' trust and confidence.

**13 Information Management and Protection**

We safeguard and apply high ethical standards in the proper collection, use, management and protection of our Company's proprietary information, as well as information entrusted to us by others

\* \* \*

**15 Reporting and Responding to Misconduct**

We enable the Company to address potential misconduct and safeguard its reputation by speaking up when we see or suspect something improper, and we will not tolerate retaliation against anyone who raises a concern or provides information in connection with an investigation.

64.    Additionally, the Code of Conduct includes a section regarding waivers, which states, in relevant part:

> Waivers of this Code of Conduct for our directors and executive officers require approval by Organon's Board of Directors, and waivers involving any other employee require the written approval of the Chief Ethics and Compliance Officer. Any waiver for a director or an executive officer shall only be granted in exigent circumstances and shall be disclosed as required by the rules of the Securities and Exchange Commission and the New York Stock Exchange.

65.    In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## <u>AUDIT COMMITTEE CHARTER</u>

66.    The Company also maintains an Audit Committee Charter. The Charter explains

that the purpose of the Audit Committee is to assist the Board of Directors in fulfilling its oversight

responsibility for:

(a)    the integrity of the Company's financial statements and financial statement audits;

(b)    the accounting and financial reporting processes and system of internal controls over financial reporting and disclosures of the Company and its subsidiaries;

(c)    the Company's compliance with legal and regulatory requirements (recognizing that other Board committees assist the Board in reviewing other areas of legal and regulatory compliance);

(d)    the qualifications and independence of the Company's registered public company accounting firm ("Independent Auditor");

(e)    the performance of the Company's internal audit function and the Company's Independent Auditor;

(f)    the Company's risk assessment and risk management processes; and

(g)    preparation of the Audit Committee report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

67.    Under the heading titled "Duties and Responsibilities," in the subsection titled

"Financial Statements," the Audit Committee Charter states that the Audit Committee shall:

(g)     Meet to review and discuss with management and the Independent Auditor the annual audited and quarterly unaudited financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the Independent Auditor's reports related to the financial statements.

(h)    Recommend to the Board, based on the review and discussion described in paragraphs (b), (c), (e) and (g) above, whether the financial statements should be included in the Annual Report on Form 10-K.

(i)    Review and discuss (at least annually) reports from the Independent Auditor and management regarding:

(1)    the adequacy and effectiveness of the Company's internal

controls, including any significant deficiencies in internal controls;

(2)  the adequacy and effectiveness of the Company's disclosure controls and procedures; and

(3)  management's evaluation of the adequacy of internal controls, including the attestation by the Independent Auditor

(j)  Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies, including any non-GAAP or pro-forma information

(k)  Review any significant issues concerning litigation and contingencies with management, counsel and the Independent Auditor.

68.  Under the same heading, in a subsection titled "Internal Audit," the Audit Committee Charter states that the Audit Committee shall:

(l)  Approve the scope of the internal audit plan for the current year. Review the adequacy of internal audit resources and the summary of results of the internal audit program.

(m)  Annually review and discuss the performance and effectiveness of the internal audit function. Review annually with the Chief Financial Officer the performance of the head of internal audit.

(n)  Review and concur in the appointment, and replacement or dismissal when appropriate, of the head of internal audit

(o)  Review and approve the internal audit charter

69.  Under the same heading, in a subsection titled "Risk Assessment, Management and Compliance," the Audit Committee Charter states that the Audit Committee shall:

(p)  Periodically review the Company's enterprise risk assessment policies and process, including meeting at least annually with the Chief Information Officer regarding the Company's information technology and receiving periodic updates on the Company's cybersecurity risk management program. Report to the Board on the principal risks facing the Company, and the steps being taken to manage and mitigate these risks.

(q)     Monitor the Company's compliance program with respect to legal and regulatory requirements (other than requirements that are being monitored by other committees), the Company's code(s) of conduct and the Company's policies on ethical business practices and report on the same to the Board. Receive reports from the chief compliance officer on a regular basis. Review and approve any waivers of the Company's code(s) of conduct for directors and executive officers.

(r)     Establish and oversee procedures for handling (receipt, retention and treatment, on a confidential basis) of complaints of potential misconduct, including: (1) violations of law or the Company's code(s) of conduct; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

(s)     Establish and periodically review policies and procedures for the review, approval and ratification of related person transactions, and review and approve, disapprove or ratify related person transactions in accordance with these policies and procedures. "Related person transactions" are defined in applicable SEC rules and include transactions involving directors, executive officers, and five percent and greater shareholders. Oversee other related party transactions governed by applicable accounting standards.

(t)     Review the directors' and officers' indemnity and Fiduciary Liability Insurance coverage for the Company's officers and non-management directors.

(u)     Review the Company's privacy policies and practices.

70.     In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and

properly report violations of the Audit Committee Charter.

## SUBSTANTIVE ALLEGATIONS

### Background

71.     Organon is a global healthcare company primarily focusing on women's health. The Company offers a range of health solutions through a portfolio that includes prescription therapies and medical devices, spanning women's health, biosimilars and established brands.

### False and Misleading Statements

### October 31, 2024 Earnings Call

72.     On October 31, 2024, after the Company published its 3Q24 Press Release detailing Organon's third quarter 2024 financial results, Organon's executive officers held the 3Q24 Earnings Call. During the call, Defendant Ali explained the Dermavant acquisition, stating, in relevant part:

> The acquisition also nicely leverages Organon's existing therapeutic expertise in dermatology. Our existing dermatology portfolio of 7 products outside the U.S. delivered $240 million of revenues in 2023. The addition of VTAMA allows us to create a dermatology presence in the U.S., where we have a very experienced and scaled access team at the local state and national levels. We expect to be in a position to launch the AD indication immediately after approval, focused on expanding access, ultimately improving VTAMA's gross-to-net over time. We'll also have the potential to launch internationally down the road. Overall, we believe we are the best owner of VTAMA with solid growth prospects and healthy margins. We believe it will contribute solidly to the financial profile of Organon.

> * * *

> In addition to reporting our results today, we are able to share more about our Dermavant acquisition and its key assets, VTAMA, which we closed on Monday. VTAMA is a nonsteroidal topical cream already approved for the treatment of plaque psoriasis in adult patients. VTAMA also has a Q4 PDUFA date for a potential new indication, the topical treatment of atopic dermatitis in adults and pediatric patients 2 years of age and older. The near-term potential for the proposed atopic dermatitis indication is the much more attractive opportunity for us for 2 main reasons. First, the size of the market. There are 3x as many patients suffering from atopic dermatitis as compared to psoriasis. And second, for those millions of patients, if approved, we believe VTAMA can address an existing gap in the

standard of care for atopic dermatitis.

There is a significant unmet need in atopic dermatitis for the treatment option with the efficacy of a biologic and with the safety and tolerability profile of a topical treatment that can be used long term. This point is especially important as nearly half of all atopic dermatitis sufferers are children. Because of this unique clinical profile, we believe VTAMA will be much better positioned in the atopic dermatitis market than it ever was in the psoriasis market. In fact, in our view, the opportunity for VTAMA in AD versus psoriasis is night and day.

73.     Later during the 3Q24 Earnings Call, Defendant Walsh discussed with analysts and

investors the potential impact the Dermavant acquisition would have on the Company, stating, in

pertinent part:

We provide a closer look at our cash flow year-to-date. *And despite some minor headwinds from the Dermavant acquisition, as Kevin mentioned, we're well on track to deliver approximately $1 billion of free cash flow before onetime charges.* Year-to-date, those onetime spin-related costs were $137 million. Our global ERP implementation is now behind us, and that was the largest driver of these onetime costs. Our view into the fourth quarter is that costs in this category will be minimal. So we expect to finish the year at approximately $150 million which is better than the $200 million of onetime spin-related costs that we were originally forecasting for 2024. Next year, in 2025, we would expect onetime spin-related costs to be de minimis.

In the $129 million of other onetime costs, here, we capture head count restructuring initiatives and manufacturing network optimization. The cash outlay for these network optimization costs have amounted to $44 million year-to-date 2024. They are distinct from the spin-related costs and that they're associated with actions to separate our manufacturing and supply chain activities away from Merck, which will ultimately drive cost efficiencies and eventual gross margin improvement. We expect this bucket to total about $75 million this year.

Turning to Slide 12. *We ended the quarter at 4.0x on our net leverage ratio, which was a 0.25 turn better than this time last year and also slightly better than where we were at year-end, 4.1x. Year-to-date, we have had stronger EBITDA generation, which has resulted in a leverage ratio at September 30, 2024, that is more favorable than our expectations at the start of the year. That said, it will take us several quarters to digest the Dermavant acquisition before leverage can return to the 4.0x net leverage ratio that we've achieved as of this quarter end.*

*February 13, 2025 Earnings Call*

74.     On February 13, 2025, after the end of the fourth quarter and 2024 fiscal year, the

Company published its financial results in a press release (the "FY24 Press Release") and hosted

an accompanying earnings call (the "FY24 Earnings Call"). While on the FY24 Earnings Call,

Defendant Ali stated, "Three, consistent deployment of capital. We're committed to our regular

dividend as our #1 capital allocation priority."

75.    On the same FY24 Earnings Call, Defendant Walsh stated, in relevant part:

> As we think about capital allocation, the priority, as Kevin mentioned, is our
> dividend. And in the past 2 years, the highest and best use of the remaining cash
> flow has been opportunistic business development. In 2024, we made upfront and
> milestone payments totaling about $350 million. In 2025, we expect to pay a little
> over $200 million in commercial milestones. We've already paid about $130
> million between Vtama's AD approval and Emgality commercial milestones. An
> additional $30 million to $70 million would be due if milestones for Henlius and
> SJ02 are met. The achievement of these milestones means that we're realizing value
> for business development already signed and validates the path to low to mid-
> single-digit revenue growth post 2025 that we've been saying Organon should be
> able to deliver.

76.    The above statements in ¶¶ 72-75 were materially false and misleading and failed

to disclose, *inter alia*, that: (1) despite claims that quarterly dividends were the Company's "#1

capital allocation priority," future payments were at risk; (2) after acquiring Dermavant, the

Company shifted its capital allocation strategy to focus on reducing debt; and (3) this debt

reduction plan would result in an over 70% cut to the quarterly dividend. As a result of the

foregoing, the Company's statements about its business, operations, and prospects were materially

false and misleading and/or lacked a reasonable basis at all relevant times.

### *False and Misleading 2025 Proxy Statement*

77.    On April 25, 2025, the Company filed with the SEC its 2025 Proxy Statement. The

Director-Defendants (defined below) solicited the 2025 Proxy Statement, filed pursuant to Section

14(a) of the Exchange Act, which contained material misstatements and omissions.

78.    The 2025 Proxy Statement solicited shareholders to, *inter alia*: reelect the eleven Director-Defendants to the Board.

79.    Regarding the Company's Code of Conduct, the 2025 Proxy Statement provided, in relevant part:

> In addition, as part of our ethics and compliance program, our Board has approved a Code of Conduct, which is available on our website at www.organon.com/about-organon/mission-vision-and-values/code-of-conduct. The information contained on or accessible through our website does not constitute a part of this proxy statement and is not incorporated herein by reference.

80.    Regarding the Board's role in "Risk Oversight," the 2025 Proxy Statement provided, in relevant part:

> The Board's oversight of Organon's risk is an important component of the Board's engagement on strategic planning, and the Board has two primary methods of overseeing risk. The first method is through Organon's Enterprise Risk Management ("ERM") process, which enables Board oversight of the most significant risks facing Organon. The second method is through the functioning of the four standing committees of the Board — the Talent Committee, the Audit Committee, the Environmental, Social and Governance Committee ("ESG Committee") and the Portfolio Development Committee.

81.    The Director-Defendants caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) despite claims that quarterly dividends were the Company's "#1 capital allocation priority," future payments were at risk; (2) after acquiring Dermavant, the Company shifted its capital allocation strategy to focus on reducing debt; and (3) this debt reduction plan would result in an over 70% cut to the quarterly dividend. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

82.    The 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and

misleading statements and omissions alleged herein; and (2) failing to report violations of the Code

of Ethics. Further, the 2025 Proxy Statement was materially false and misleading because, despite

assertions to the contrary, the Board was not adequately performing its risk oversight functions.

83.     As a result of the Director-Defendants causing the 2025 Proxy Statement to be false

and misleading, Company shareholders voted, *inter alia*, to reelect the Director-Defendants to the

Board, allowing them to continue to breach their fiduciary duties to the Company.

**The Truth Fully Emerges**

*May 1, 2025 Press Release*

84.     The truth did not fully emerge until May 1, 2025, when Organon published its 1Q25

Press Release, revealing that the Company's management reset the dividend payout from $0.28 to

$0.02. In the 1Q25 Press Release and with respect to the dividend, Defendant Ali stated, in relevant

part:

> We have reset our capital allocation priorities to accelerate progress towards
> deleveraging, enabling a path to achieve a net leverage ratio of below 4.0x by year-
> end. Over the last year, we have established a leaner, more fit-for-purpose cost
> structure while increasing revenue contribution from our core growth drivers. By
> deleveraging more rapidly, we will continue to strengthen the future prospects of
> the company. Over time, this will position us to execute more of the compelling
> business development we've done to date, bringing in additional growth drivers to
> our portfolio, while maintaining lower leverage. With key growth drivers,
> Nexplanon and Vtama, on track to achieve their revenue objectives for the year, we
> are affirming our full year revenue and Adjusted EBITDA margin guidance, as well
> as our target of generating over $900 million of free cash flow before one-time
> costs.

*May 1, 2025 Earnings Call*

85.     That same day, the Company held its 1Q25 Earnings Call. After the Company had

published its financial results, Defendant Ali issued a statement regarding the change in dividend

strategy, stating, in pertinent part:

> Today, we also announced that we have reset our dividend payout, and we'll redirect

30

those funds to debt reduction. With a reduced dividend payout, the company can redeploy almost $200 million in prospective dividend payments over the remainder of 2025 that will enable a path to achieve a net leverage ratio below 4 by year-end.

86.    Also on the 1Q25 Earnings Call, Defendant Walsh further explained the following, in relevant part:

> The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issues, and so returning capital to shareholders is right now, less of a priority. It's one of the reasons why we made the move that we did with the dividend announcement today.

87.    In addition, during the question-and-answer portion of the 1Q25 Earnings Call, Defendants Ali and Walsh answered questions concerning the dividend reset and redirection of funds, stating, in pertinent part:

> <Q: Ethan Harris Brown – JPMorgan Chase – Analyst> This is Ethan on for Chris Schott. On the first question, I just wanted to ask about capital allocation more broadly in your framework going forward. And maybe more specifically, how share repo might fit into that equation relative to debt paydown and business development. And then my second question is just on the potential impact of tariffs. I know you provided some commentary on 2025. But any general color on your ability to navigate this dynamic looking past 2025, although details are lacking, maybe just frame how you're thinking about that impact.

> <A: Kevin Ali – CEO & Director> Yes, Ethan, I think Matt and I will ping pong on addressing these topics. So I'll keep the tariff issue aside for Matt to deal with. But on capital allocation, really briefly, right? Look, we're doing this. I want to be clear. We're doing this from a position in terms of what we've done with the dividend today, what we announced from a position of strength. Over the last few years, we have, for example, reestablished NEXPLANON, our key product where we're going to surpass $1 billion this year. We have stabilized the established brands business.

> We have essentially regrowing our fertility business. We have also successfully launched JADA and Hadlima and Emgality and now VTAMA and TOFIDENCE. And so we're very comfortable with the fact that going forward, some of the headwinds we faced this year with the loss of exclusivity of our second largest product out of that will be behind us. And essentially going forward, we have opportunities really to accelerate our top line and bottom line growth. And so for that -- and we've done 3 restructurings in the last 1.5 years. So we're a much more leaner fit-for-purpose organization. This is really done in order to be able to set us

up so that in the future, we can do more business development deals like the VTAMA and Topaz deal that we just did recently in order to be able to continue to grow, continue to grow for the long term. And so I believe this is a position of -- right? And when it comes now to your second question around tariffs, I'll hand that over to Matt in terms of -- in regards to the fact of what we see today is not something that we feel very concerned about, but . . .

* * *

<A: Matthew M. Walsh – Executive VP & CFO> Sure. So share buybacks have been a lower priority for us in our roster of capital allocation priorities. The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issues, and so returning capital to shareholders is right now, less of a priority. It's one of the reasons why we made the move that we did with the dividend announcement today.

So -- and especially as long as our leverage is above 4x I believe we'll create more value and better positioning and overall strength for the future by rightsizing our leverage versus buying back shares.

* * *

<Q: Umer Raffat – Evercore ISI Institutional Equities – Analyst> I mean, look, I feel like Dermavant deal was a surprise, but today is a bigger surprise, and there's a lot of market sentiment that they can't have confidence in consistency and decision-making process at Organon right now. So specifically, last call, you guys said you're committed to regular dividend as the #1 capital allocation priority. I think you just now said return on capital is a lower priority. And I guess the question is really for all the investors on the line. What is the priority? And how can we be sure that this will be the priority going forward because there appears to be a lot of things just moving around constantly.

<A: Kevin Ali> Umer, thanks for the question. And if you notice things are going on in the outside macro environment is changing. It's quite volatile out there. Clearly, investment community is not clearly focused on the dividend for us as much as it is on leverage. I hear it. in almost every discussion that I have with investors that they're very concerned about where we are in terms of leverage in these very volatile times. It's really a risk-off type of analysis.

So for us, we are very committed to that. But when we saw the type of volatility happening, we saw the timing, we're on the verge of really having, I think, a really great year in 2026 and the second half of this year, I think we're in a much better position to say, look, we know that we can delever very quickly, and as we delever and as we have a situation where we give us here is more of an opportunity, to bring in assets like VTAMA. And I will tell you that right now, if you just look at the

NRx and TRx of VTAMA, it's clearly positive signaling to the fact that we made the right decision, and hopefully, we'll be able to have a discussion at the end of the year where you see that we delivered what we said we were going to deliver with the product.

And ultimately, then you see that the run rate of where we're going with this product and the type of label we're developing was a good use of capital. And I think there's a better use of capital on bringing in more assets in that space. And so the combination of what's happening externally, coupled with where investors essentially are kind of telling us that they're very focused on delevering much more so than anything else kind of brought us to the fact. And the initial encouraging results we're really having with VTAMA and the continued strength of our core products like NEXPLANON tells us that there's a better use of that capital in terms of being able to go forward and use it to be able to not only delever but bring in growth aspects for the company.

88.    On this news, the price of the Company's stock fell $3.48 per share, or approximately 27%, from a close of $12.93 per share on April 30, 2025, to close at $9.45 per share on May 1, 2025.

## DAMAGES TO ORGANON

89.    As a direct and proximate result of the Individual Defendants' misconduct, Organon has lost and will continue to lose and expend many millions of dollars.

90.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

92.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

93.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

94.    As a direct and proximate result of the Individual Defendants' conduct, Organon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

95.    Plaintiff brings this action derivatively and for the benefit of Organon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Organon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act.

96.    Organon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.    Plaintiff is, and has been at all relevant times, a shareholder of Organon. Plaintiff will adequately and fairly represent the interests of Organon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff incorporates by reference and re-alleges each and every allegation stated

above as if fully set forth herein.

99.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Organon's Board consisted of the following eleven individuals: Defendants Ali, Cox, Essner, Ezekowitz, Gayle, Lazarus, Leone, Ozuah, Patton, Puma, and Sharp (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that were on the Board at the time this action was filed.

100.    Demand is further excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants again unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

102.    Additional reasons that demand on Defendant Ali is futile follow. Defendant Ali has served as the CEO and as a Company director since 2021. Defendant Ali has received and continues to receive handsome compensation for his role as CEO. As a trusted, long-time Company CEO and as a director, he conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, in the 2025 Proxy Statement, Organon admits that Defendant Ali is a non-independent director under NYSE Listing Standards. Moreover, Defendant Ali is named as a defendant in the Securities Class Action. For these reasons too, Defendant Ali breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Cox is futile follow. Defendant Cox has served as Chairman of the Board since 2021. She also serves as the Chair of the Talent Committee and as a member of the Portfolio Development Committee and the Environmental, Social and Governance Committee. Defendant Cox has received and continues to receive handsome compensation for her role as Chairman of the Board. As a trusted, long-time Company director and as Chairman of the Board, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Cox breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Essner is futile follow. Defendant Essner has served as Company director since 2021. He also serves as the Chair of the Environmental, Social and Governance Committee and as a member of the Portfolio Development Committee. Defendant Essner has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Essner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Ezekowitz is futile follow. Defendant Ezekowitz has served as a Company director since 2021. He also serves as a member of the Audit Committee and the Portfolio Development Committee. Defendant Ezekowitz has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Ezekowitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on Defendant Gayle is futile follow. Defendant Gayle has served as a Company director since 2021. She also serves as a member of the Environmental, Social and Governance Committee. Defendant Gayle has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Gayle breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

107.    Additional reasons that demand on Defendant Lazarus is futile follow. Defendant Lazarus has served as a Company director since 2021. She also serves as a member of the Environmental, Social and Governance Committee. Defendant Lazarus has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Lazarus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Leone is futile follow. Defendant Leone has served as a Company director since 2021. She also serves as a member of the Audit Committee. Defendant Leone has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Leone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

109.    Additional reasons that demand on Defendant Ozuah is futile follow. Defendant Ozuah has served as a Company director since 2021. He also serves as the Chair of the Portfolio

Development Committee and as a member of the Talent Committee. Defendant Ozuah has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Ozuah breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Patton is futile follow. Defendant Patton has served as a Company director since 2021. She also serves as a member of the Audit Committee. Defendant Patton has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Patton breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Puma is futile follow. Defendant Puma has served as a Company director since 2021. She also serves as a member of the Talent Committee. Defendant Puma has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in

the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Puma breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Sharp is futile follow. Defendant Sharp has served as a Company director since 2021. She also serves as the Chair of the Audit Committee and as a member of the Portfolio Development Committee. Defendant Sharp has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Sharp breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

113.    Additional reasons that demand on the Board is futile follow.

114.    Defendants Ezekowitz, Leone, Patton and Sharp (as Chair) (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board

oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

115.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

116.    Organon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Organon any part of the damages Organon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

117.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

118.    The acts complained of herein constitute violations of fiduciary duties owed by Organon's officers and directors, and these acts are incapable of ratification.

119.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Organon. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Organon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

120.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Organon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

121.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

122.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

123.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Organon's business and affairs.

124.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

125.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Organon.

126.    In breach of their fiduciary duties owed to Organon, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) despite claims that quarterly dividends were the Company's "#1 capital allocation priority," future payments were at risk; (2) after acquiring Dermavant, the Company shifted its capital allocation strategy to focus on reducing debt; and (3) this debt reduction plan would result in an over 70% cut to the quarterly dividend. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

127.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

128.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

129.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Organon's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

130.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Organon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

### SECOND CLAIM
#### Against the Individual Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

134.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Organon.

135.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Organon that was tied to the performance or artificially inflated valuation of Organon, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

136.    Plaintiff, as a shareholder and a representative of Organon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

137.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Organon, for which they are legally responsible.

140.    As a direct and proximate result of the Individual Defendants' abuse of control, Organon has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Organon has sustained and continues to sustain significant damages. As a result of the misconduct alleged

herein, the Individual Defendants are liable to the Company.

141.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Organon in a manner consistent with the operations of a publicly held corporation.

144.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Organon has sustained and will continue to sustain significant damages.

145.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

149.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Organon to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

150.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

151.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

### SIXTH CLAIM
### Against Defendants Ali and Walsh for Contribution Under Sections 10(b) and 21D of the Exchange Act

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    Organon and Defendants Ali and Walsh are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Ali's and Defendant Walsh's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

154.    Defendants Ali and Walsh, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

155.    Accordingly, Defendants Ali and Walsh are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C.

§ 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

156.    As such, Organon is entitled to receive all appropriate contribution or indemnification from Defendants Ali and Walsh.

## SEVENTH CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

160.    Under the direction and watch of the Individual Defendants, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy

Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

161.    The 2025 Proxy Statement also failed to disclose that: (1) despite claims that quarterly dividends were the Company's "#1 capital allocation priority," future payments were at risk; (2) after acquiring Dermavant, the Company shifted its capital allocation strategy to focus on reducing debt; and (3) this debt reduction plan would result in an over 70% cut to the quarterly dividend.

162.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the reelection of various of the Individual Defendants to the Board.

163.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

164.    Plaintiff, on behalf of Organon, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Organon, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to Organon;

(c)     Determining and awarding to Organon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Organon and the Individual Defendants to take all necessary actions to reform and improve Organon's corporate governance and internal procedures to comply with applicable laws and to protect Organon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Organon to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Organon restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: June 17, 2025

                                           **THE BROWN LAW FIRM, P.C.**

                                           */s/ Elizabeth J. Donohoe*
                                           Elizabeth J. Donohoe
                                           Zachary M. Benson
                                           Timothy Brown
                                           767 Third Avenue, Suite 2501
                                           New York, NY 10017
                                           Telephone: (516) 922-5427
                                           Facsimile: (516) 344-6204
                                           Email: edonohoe@thebrownlawfirm.net
                                                      zbenson@thebrownlawfirm.net
                                                      tbrown@thebrownlawfirm.net

                                           *Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Jereth Camacho, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17___ day of June, 2025.

DocuSigned by:

BDABD82DD7574A3...

Jereth Camacho